UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| ALBERT LUTES, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | Case No. 3:20-cv-00209 |
|  | ) | Judge Aleta A. Trauger |
|  | ) |  |
| CHRISTINE WORMUTH, Secretary of | ) |  |
| the Department of the Army, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## MEMORANDUM

The Secretary of the Army[1] has filed a Motion for Summary Judgment (Doc. No. 28), to which Albert Lutes has filed a Response (Doc. No. 41), and the Secretary has filed a Reply (Doc. No. 44). Lutes has filed a Motion for Summary Judgment (Doc. No. 33), to which the Secretary has filed a Response (Doc. No. 42). For the reasons set out herein, the Secretary's motion will be granted, and Lutes' motion will be denied.

## I. BACKGROUND

Lutes was born in 1962 and served in the United States Army for twenty-two years. In 2009, after he had retired from service, Lutes accepted a civilian position as a Radio Logistics Assistance Representative Equipment Specialist at Fort Campbell, along the border of Kentucky and Tennessee. (Doc. No. 43 ¶¶ 1–5.) Lutes' job requires him to be available for deployment abroad as needed. As of the latest filings addressing the matter, Lutes had been deployed overseas

---

[1] This case was originally filed against Acting Secretary Ryan D. McCarthy, in his official capacity. Secretary Christine Wormuth was automatically substituted as the named defendant pursuant to Fed. R. Civ. P. 25(d).

in his civilian capacity six times, including deployments to Afghanistan and Guantanamo Bay, Cuba. (Doc. No. 43 ¶ 8.)

U.S. Central Command ("CENTCOM") requires that civilian employees over the age of 40 undergo a cardiovascular risk assessment before deploying to a CENTCOM Area of Operation ("AOR"). (Doc. No. 43 ¶¶ 10–11.) Lutes, who turned 40 in 2002, is subject to that requirement. (*Id.* ¶ 14.) Because a cardiovascular risk assessment necessarily involves making difficult predictions based on limited information, certain factors that are known to represent substantial, well-established cardiovascular hazards inevitably play a large role. In Lutes' case, one such factor is his smoking. At all points relevant to this case, Lutes smoked about a pack of cigarettes per day, which he has done for over twenty-five years. Lutes' smoking places him at an immediate disadvantage in terms of obtaining a favorable risk assessment and renders it more likely that additional factors would push him above a level of risk that CENTCOM would be willing to accept. (Doc. No. 41-1 ¶¶ 5, 10.)

The evaluation of the employee's cardiovascular risk has historically been performed pursuant to the Framingham Risk Assessment ("FRA") tool, which is an algorithm that uses basic data about a patient to estimate the risk of developing coronary heart disease during the next ten years.[2] (*Id.* ¶¶ 7–10.) The FRA uses information commonly collected from or about patients as part of ordinary examination and/or care—namely, the patient's gender, age, total cholesterol (mg/dl), HDL cholesterol (mg/dl), and systolic blood pressure (mmHg), along with whether the patient is in treatment for hypertension and whether the patient is a smoker. (*Id.* ¶ 10.) Under

---

[2] The FRA is apparently no longer considered the leading available tool for this purpose, having allegedly been superseded by the AtheroSchlerotic CardioVascular Disease ("ASCVD") screening tool. (Doc. No. 41-1 ¶ 17.) The parties agree, however, that the FRA and ASCVD "would give roughly the same result," and either was acceptable to CENTCOM. (*Id.* ¶ 18.)

CENTCOM policy, if the employee scores 15% or higher on his risk assessment, he must obtain a waiver from CENTCOM before deploying. (*Id.* ¶ 12.)

At the times most relevant to this case, waiver requests were governed by Modification Thirteen to CENTCOM's Individual Protection and Individual-Unit Deployment Policy ("MOD 13"), which stated:

> If the individual's calculated 10-year [risk assessment score] is 15% or greater, the individual should be referred for further cardiology work-up and evaluation, to include at least one of the following: graded exercise test with a myocardial scintigraphy (SPECT scan) or stress echocardiography as determined by the evaluating cardiologist. Results of the evaluation . . . and testing, along with the evaluating cardiologist's recommendation regarding suitability for deployment, should be included in a waiver request to deploy.

(Doc. No. 43 ¶ 10.) MOD13 directed that "the final authority of who may deploy to the CENTCOM AOR rests with the CENTCOM Surgeon and/or the Service Component Surgeon's waiver authority, not the individual's medical evaluating entity or deploying platform." (Doc. No. 41-1 ¶ 15.)

In late 2017, Lutes was informed that he was scheduled to be deployed to a CENTCOM AOR—specifically, Kuwait—in February of 2018. (Doc. No. 43 ¶ 23; Doc. No. 45 ¶ 58.) A few years earlier, in 2014, Lutes had been required to undergo a significant battery of tests due to an above-threshold FRA score calculated in connection with another planned deployment. In that instance, he ultimately underwent a cardiac catheterization and received a waiver that permitted him to deploy, albeit later than expected. (Doc. No. 43 ¶¶ 12–22.) Lutes testified that, in light of the extensive process that he had undertaken to become deployment-ready in 2014, he did not expect there to be much problem being cleared before deployment in 2018. (*Id.* ¶ 24.)

The first part of Lutes' pre-deployment physical was performed on January 3, 2018. Because Lutes was over 40, the information from that physical was used to calculate his FRA

score, which came in at 20%. (*Id.* ¶ 25.) A second part of the physical was performed a week later, on January 10, 2018. After that encounter, Nurse Susan Hightower submitted a request for a CENTCOM waiver related to Lutes' FRA score. The parties disagree regarding whether Lutes specifically requested that she do so, but they agree that, under CENTCOM's policy, such a waiver was necessary. (*Id.* ¶ 28.)

Hightower's initial request for a waiver on Lutes' behalf was denied, with an instruction to "[p]lease provide updated cardiac evaluation for proper adjudication of request." (*Id.* ¶ 29; Doc. No. 32-2 at 2.) To that end, Lutes scheduled a stress test, to be performed by Dr. Thomas Dove on January 26, 2018. (Doc. No. 41-1 ¶ 86–87.) Before the treadmill component of the test could begin, however, Lutes' blood pressure was taken to, among other things, determine whether it was within a safe range for the administration of an exercise-based test. It was not, at least not in the assessment of Dr. Dove. Specifically, Lutes' diastolic blood pressure—the lower of the two numbers included in a standard blood pressure score—had risen to 104 or 105, which left Dr. Dove "very concerned."[3] Dr. Dove postponed the test and arranged a follow-up with Lutes' private physician, Dr. Ramon Aquino. (*Id.* ¶¶ 88–90; Doc. No. 34-2 at 86.)

Lutes was already on blood pressure medication and had been "for years." (Doc. No. 41-1 ¶ 92.) During his deposition, Lutes admitted that his unexpectedly high reading on January 26, 2018, was due to the fact that his "body [had] changed and the medication didn't," although Lutes also mentioned the possibility that he "wasn't keeping up with it." (*Id.* ¶ 93; Doc. No. 34-1 at .) In any event, Lutes visited Dr. Aquino, who agreed that his blood pressure warranted attention, and

---

[3] Lutes' blood pressure had been 132/88 on January 3, 2018, when he underwent the first part of his physical. (*Id.* ¶¶ 25–26.) His blood pressure at the time of the second exam a week later, however, was 148/74. (*Id.* ¶ 27.) While this variation may be striking, it is irrelevant to this case, because, as the court will explain, Lutes' blood pressure is relevant to the underlying events not because it was high, in and of itself, but because the high reading prompted a change in his treatment.

4

Dr. Aquino adjusted Lutes' medication regimen. (*Id.* ¶¶ 96–97.) As Lutes put it, "[h]e adjusted . . . my medication, and my blood pressure came back in line." (Doc. No. 34-2 at 86.)

The Army requires that, if a civilian employee of any age undergoes a change in certain medications, he must wait six months before being deployed to a CENTCOM AOR. (Doc. No. 41-1 ¶¶ 98, 102.) That six-month waiting period disqualified Lutes from the February 2018 deployment he was originally expecting. In discovery for this case, Lutes was asked to confirm or deny whether he "was removed from the roster for deployment to US CENTCOM operational areas because of his score of 20% on the FRA, with no approved waiver given," and he responded: "Denied. I had a change in my blood pressure medicine and was denied because I had not been on stable meds for six months." (Doc. No. 37-15 at 9; Doc. No. 41-1 ¶ 92.)

Instead of being deployed to Kuwait, Lutes was deployed to South Korea, which was not under CENTCOM's jurisdiction and therefore did not require the same level of medical clearance. Lutes maintains that the differences in pay for the respective deployments, particularly their different *per diem* rates, ultimately cost him around $40,000 to $45,000 dollars, which the Secretary does not dispute for the purposes of the pending motions. (Doc. No. 41 ¶¶ 103–05; Doc. No. 43 ¶¶ 34–37.) Since then, Lutes has successfully redeployed to a CENTCOM AOR pursuant to a CENTCOM waiver, following another cardiac catheterization. (Doc. No. 43 ¶¶ 38–40.)

Lutes exhausted his administrative options for recourse related to the missed Kuwait deployment, and, on March 9, 2020, he filed a Complaint against the Secretary in this court pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634. (Doc. No. 1.) In the Complaint, Lutes alleges that he was subjected to "discrimination based upon the policy of requiring individuals over the age of forty . . . to take and score below 15% on the Framingham Risk Assessment before deploying to CENTCOM operational sites overseas

while employees thirty-nine . . . and younger are not required to take the test[,] nor does their score matter." (*Id.* ¶ 19.) He "seeks damages from Defendant to include, but not limited to, lost wages, lost benefits, compensatory damages, and attorney fees and costs." (*Id.* at 5.) Lutes does not expressly request any non-monetary remedies, although he, like most plaintiffs, does generically request "such other, further, general and different relief to which he may show [himself] entitled." (*Id.* at 6.) Each party now seeks summary judgment (Doc. Nos. 28, 33.)

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of its claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is

6

"genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

### III. ANALYSIS

Because the Army is a federal employer, Lutes' ADEA claim is governed by the Act's separate "federal-sector" provision, 29 U.S.C. § 633a. That section "provides (with . . . a few exceptions) that 'personnel actions' affecting individuals aged 40 and older 'shall be made free from any discrimination based on age.'" *Babb v. Wilkie*, 140 S. Ct. 1168, 1171 (2020) (quoting 29 U.S.C. § 633a(a)). The term "personnel action" has been construed "to include most"—but not all—"employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews." *Id.* at 1173 (citing 5 U.S.C. § 2302(a)(2)(A)). It is undisputed at this stage that exclusion from a deployment resulting in lost pay is a personnel action. Barring a civilian employee from deployment for reasons that were not "free from any discrimination based on age" would therefore violate the ADEA.

Lutes, however, was not denied his 2018 CENTCOM deployment due to his age, at least not directly. Nor was he denied the deployment based on the results reached by a tool, like the FRA, that is applied by the Army only to older employees. Lutes, as he has openly conceded, was denied his deployment because his private primary care physician, through the exercise of his own judgment, changed Lutes' blood pressure medication, which gave rise to an age-neutral six-month mandatory period of nondeployment. One might therefore be inclined to conclude that this is simply not a case about discrimination. The Supreme Court's recent interpretation of the relevant provisions of the ADEA in *Babb v. Wilkie*, 140 S. Ct. 1168 (2020), however, significantly complicates the matter.

7

Prior to *Babb*, the lead case on causation in the ADEA context was *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), in which the Supreme Court "focus[ed] on the text of the ADEA to decide whether it authorizes a mixed-motives age discrimination claim," concluding, ultimately, that "[i]t does not." *Id.* at 175. *Gross* involved a claim against a private employer and therefore did not directly address the federal-sector provision, 29 U.S.C. § 633a, but rather the corresponding—but not identical—"private-sector"[4] provision, 29 U.S.C. § 623(a). The opinion of the Court in *Gross* does not focus on that distinction, speaking primarily of just "the ADEA," which led to some courts' applying *Gross* to federal-sector plaintiffs, while others did not. *Compare Shelley v. Geren*, 666 F.3d 599, 607 (9th Cir. 2012) (applying *Gross* under federal-sector provision) *with Ford v. Mabus*, 629 F.3d 198, 205–06 (D.C. Cir. 2010) (holding that *Gross* does not apply under the federal-sector provision); *see also Reynolds v. Tangherlini*, 737 F.3d 1093, 1103 (7th Cir. 2013) (acknowledging uncertainty among courts on the issue). Nevertheless, the fact that the holding in *Gross* was premised on the language of the private-sector provision left open the possibility that the Court might reach a different conclusion regarding mixed-motive cases against federal employers.

That was the issue posed by *Babb*, which involved an ADEA claim against the U.S. Department of Veteran Affairs. Based on a close reading of the particular language of the federal-sector provision, the Supreme Court concluded that that provision, unlike its private-sector counterpart, "goes further than" merely prohibiting personnel actions that were the "but-for" result of the employee's age and that a plaintiff may therefore establish a "mixed-motive" violation of

---

[4] "Private-sector" is, in this instance, at least partially a misnomer, because the provision at issue applies not only to private employers but also to state and local governments. *See* 29 U.S.C. § 630(b). For clarity, the court will use the same "private-sector" shorthand as the Supreme Court has used, *see Babb*, 140 S.Ct. at 1175, although a more accurate, if also more unwieldy, name would be the "non-federal-sector provision."

8

the Act, even in the absence of but-for causation. *Babb*, 140 S.Ct. at 1171. That holding, in and of itself, would not necessarily be difficult to apply; mixed-motive discrimination claims have been considered by federal courts for years—particularly since the codification of the standard for such claims under Title VII in the Civil Rights Act of 1991, *see Smith v. Wilson*, 705 F.3d 674, 680 (7th Cir. 2013)—and jurisprudential tools have been developed for considering the underlying issues. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396–98 (6th Cir. 2008) (discussing legislative and judicial development of Title VII mixed-motive claims).

What makes *Babb* more challenging is the standard it imposes as an alternative to but-for causation. Title VII mixed-motive cases are evaluated based on whether "race, color, religion, sex, or national origin was a motivating factor for" the employment action at issue. *White*, 533 F.3d 381, 397 (quoting 42 U.S.C. § 2000e–2(m)). That language comes directly from the amendment addressing mixed-motive cases in the Civil Rights Act of 1991. When the Supreme Court, in *Babb*, chose to step away from the but-for causation standard, however, it did not have a similar readymade statutory standard to put in its place. Based on the particular wording of the federal-sector provision—particularly the phrase "free from"—the Court concluded that the ADEA requires that federal personnel actions must be "*untainted by* any consideration of age." *Babb*, 140 S.Ct. at 1171 (emphasis added). How that test should actually be put into operation, however, remains something of an open question, considering how recently *Babb* was issued.[5] *See Norman v. McDonough*, No. 2:20-CV-01765-KOB, 2022 WL 3007595, at *1 (N.D. Ala. July 28, 2022) (noting that the "recently modified the causation standard" set forth in *Babb* required the court to

---

[5] For example, the Sixth Circuit has, as far as the court can tell, only expressly applied *Babb* in one federal-sector ADEA case—and, even then, discussed *Babb* only briefly, in a footnote summarizing its central holding. *See Bledsoe v. TVA. Bd. of Directors*, No. 21-5808, 2022 WL 2965630, at *4 n.1 (6th Cir. July 27, 2022).

9

"tread[] somewhat new ground"). The *Babb* standard might, in practice, function the same way that the established Title VII mixed-motive standard does. Nevertheless, it is not clear to the court that that is necessarily the case, in light of the specific language used by the Supreme Court in *Babb*.

Indeed, this case poses a particularly striking example of the difficulties posed by the "tainted by consideration of age" standard. In *Babb*, the Court focused primarily on the prospect of cases in which consideration of age *was not* a but-for cause of the personnel action at issue but *did* arguably taint the reasoning of the relevant "decision-maker"; that is, conventional mixed-motive cases. See *Babb*, 140 S. Ct. at 1174. This case presents the opposite situation: the Army's age-conscious policies *did* cause the personnel action of not deploying Lutes as a matter of literal, but-for causation, but no consideration of age was involved in the actual "decision-making" that dictated that outcome. The ordinary definition of "taint," however, could be read to encompass such a situation as well. *See* TAINT, Black's Law Dictionary (11th ed. 2019) ("1. To imbue with a noxious quality or principle. 2. To contaminate or corrupt. 3. To tinge or affect for the worse.").

The but-for causation at issue in this case is relatively straightforward, although it requires a few steps: because of Lutes' age, he was subjected to a cardiovascular risk assessment; because of that risk assessment, he was sent to a stress test; at that stress test, which would not have occurred but for the age-based policy, Lutes' dangerously high blood pressure happened to be detected, after having failed to present in earlier examinations; because of that discovery, Lutes went to his own private primary care physician, who adjusted Lutes' medication; and, finally, because of that change in medication, Lutes missed his deployment. That path might be circuitous, but it is clear.[6]

---

[6] The Secretary argues that, rather than following this clear step-by-step analysis, the court should consider Lutes' claims under the caselaw associated with demonstrating a *prima facie* case of discrimination through circumstantial evidence under the "familiar *McDonnell Douglas* burden-shifting framework." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S.

The degree to which Lutes' missed deployment was actually "tainted," in any meaningful way, by consideration of age is much harder to discern and probably comes down to how one thinks of the concept of taintedness itself. The age-conscious policy that Lutes was subjected to played no role in his non-deployment other than happening to appear in the chain of events leading up to the changing of his medications. That change in medications then triggered the application of a wholly separate, non-age-conscious policy that imposed an insurmountable six-month non-deployment window on Lutes. The relationship between CENTCOM's age-conscious policy and Lutes' non-deployment is not much less attenuated than if he had missed his deployment because he had been in an automobile collision on the way to the stress test and broken his leg. The actual decision not to deploy him simply was not, in any way, based on age or on an age-conscious policy, even as a non-determinative, secondary factor. That said, was the decision *untainted* by discrimination? Lutes does not think so, and the plain meaning of the word does not resolve the question. One could certainly argue that, because Lutes' ordeal was launched by the Army's age-conscious policy, the taint of that policy infected the end result.

Faced with this fresh terrain and very little guidance for how to navigate it, the court must turn to established general principles of employment discrimination law. Under those general principles of employment discrimination law, it is well-settled that establishing an "'intervening legitimate reason' to take an adverse employment action" may be sufficient to defeat an otherwise sufficient *prima facie* case of discrimination. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 628 (6th Cir. 2013) (quoting *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012)). Such

---

792, 802–04 (1973)). Such an approach would look at various contextual clues to determine whether a reasonable finder of fact could infer that discrimination occurred. This case, however, is about an expressly age-conscious policy, not circumstantial evidence of discrimination, rendering the various tools and rules of thumb found in that caselaw inappropriate.

an approach is consistent with the principle that discrimination claims typically require not merely some connection between discrimination and the ultimate challenged action—such as in the hypothetical example of an employee who broke his leg on the way to complying with an age-conscious policy—but also "[p]roximate cause," meaning "some *direct* relation between the injury asserted and the injurious conduct alleged." *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) (emphasis added) (quoting *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 8, 130 S. Ct. 983, 989 (2010)).

Proximate cause is a particularly important concept in cases, like this one, in which a discriminatory *act* led to an ostensibly non-discriminatory *employment action*. One relatively common type of such a case, for example, involves the so-called "'cat's paw' theory" of liability, in which an employee claims that the supposedly non-discriminatory discipline imposed on him was tainted by having been the result of a discriminatorily-motivated report to his supervisors. *See Cobbins v. Tennessee Dep't of Transp.*, 566 F.3d 582, 587 n.5 (6th Cir. 2009). In such cases, "[t]he proximate cause requirement follows common-law tort principles, asking whether the discriminatory acts . . . were a 'causal factor' in the *ultimate adverse employment action*," not simply the events that led to it. *Omachonu v. Shields*, No. 15-CV-69-WMC, 2015 WL 4509146, at *6 (W.D. Wis. July 24, 2015) (emphasis added) (citation omitted). Without such a rule, employers would be incapable of, for example, firing an employee who engaged in serious wrongdoing that the employer independently confirmed, simply because the employer was initially made aware of the wrongdoing by someone with an improper motive.

The court sees no reason to think that *Babb* disturbed these general principles. *Babb*, as the court has already noted, was chiefly focused on how courts should treat situations in which age-conscious and non-age-conscious factors were used alongside each other, not situations in which

12

an unambiguously age-conscious policy simply led, by happenstance, to other events that mandated the enforcement of a wholly separate, age-neutral policy. Moreover, while this is not a "cat's paw" case, the analogy is clear. The requirement of proximate cause in those cases exists to enforce the principle that Congress did not intend for one improperly-motivated action taken against an employee to render that employee effectively immune to future, otherwise wholly lawful employment actions.

As difficult as it may be to define what it means for an employment action to be "tainted" by discrimination, the court will not read the ambiguity of that one word to negate long-standing principles of employment law permitting an employer to take legitimate, independent, and non-discriminatory action based on a situation, simply because of an attenuated connection to discrimination in that situation's past. *See Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 380 (6th Cir. 2017) ("A supervisor who conducts an in-depth and truly independent investigation is not being manipulated by biased lower-level supervisors, but rather making a decision based on an independent evaluation of the situation.").

Such a holding, moreover, is reconcilable with the holding, in *Babb*, that but-for causation is not required to establish a violation of the ADEA's federal-sector provision. Although the factual question of causation and the doctrine of proximate cause consider similar facts, the latter is ultimately "not about causation at all but about the appropriate scope of responsibility." *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 609 (6th Cir. 2007) (citing Dobbs on Torts § 181). It is still the case that, under *Babb*, it is sufficient to establish liability that the ultimate personnel action at issue directly involved—that is, was tainted by—consideration of age, even if that factor was not determinative. The limitation at issue here only comes into play when the

ultimate personnel action carried no taint of that type, such that but-for causation is the only connection between the personnel action and the prior discrimination.

The court therefore concludes that the Secretary is entitled to summary judgment as to the aspects of Lutes' ADEA claim based on the missed 2018 deployment, because the intervening step of Dr. Aquino's changing Lutes' medication and triggering the waiting-period policy defeats proximate cause. Although there is no "hard-and-fast rule" for when the "traditional tort-law concept of proximate cause" dictates judgment for the defendant in an employment discrimination context, *Staub*, 562 U.S. at 420, the basis for such a holding in this case is strong. At its base, "[p]roximate-cause analysis is a kind of line-drawing exercise in which we ask whether there are any policy or practical reasons that militate against holding a defendant liable even though that defendant is a but-for cause of the plaintiff's injury." *Powers*, 501 F.3d at 609 (citing Dobbs on Torts § 181). That line-drawing exercise typically looks to factors such as "substantiality, directness, and foreseeability." *Calcutt v. Fed. Deposit Ins. Corp.*, 37 F.4th 293, 330 (6th Cir. 2022). While it may, in a sense, be foreseeable that, the more often you send a person to the doctor, the more likely he is to undergo a change in medication, the connection between the risk assessment and waiver process that Lutes challenges and the eventual decision not to deploy him in 2018 is simply not direct or substantial enough to support liability under traditional tort law concepts.

Lutes' blood pressure was dangerously high—so high that a physician was not comfortable even placing him on a treadmill. Although that high blood pressure was detected in connection with Lutes' stress test, that detection occurred through the ordinary process of taking vitals that is part of nearly every in-person medical encounter and could have happened any other time. Lutes then went to a separate appointment, with his own private doctor, during which that doctor changed

14

Lutes' medication in order to get his blood pressure back under control and, by extension, potentially save his life. Then, a wholly lawful, non-discriminatory policy directed at making sure an individual's medications are stable before he is sent overseas simply required Lutes to wait six months to be eligible to deploy. There is no reasonable basis for concluding that the ADEA outlaws such a situation.

The court's inquiry, though, is still not finished. Lutes does not allege only that he was treated unlawfully because he lost wages. Rather, he "alleges discrimination based upon the policy of requiring individuals over the age of forty (40) to take and score below 15% on the Framingham Risk Assessment before deploying to CENTCOM operational sites overseas," in and of itself. (Doc. No. 1 ¶ 19.) *Babb* expressly acknowledges the potential viability of at least some such no-lost-wages claims, by imposing a two-tiered system of remedies based on "traditional principles of tort and remedies law":

> [P]laintiffs who demonstrate only that they were subjected to unequal consideration cannot obtain reinstatement, backpay, compensatory damages, or other forms of relief related to the end result of an employment decision. To obtain such remedies, these plaintiffs must show that age discrimination was a but-for cause of the employment outcome. . . .
>
> [However], plaintiffs are not without a remedy if they show that age was a but-for cause of differential treatment in an employment decision but not a but-for cause of the decision itself. In that situation, plaintiffs can seek injunctive or other forward-looking relief.

*Babb,* 140 S. Ct. at 1177–78. In concurrence, Justice Sotomayor separately emphasized that, in her view, the federal-sector provision permits retrospective non-wage money damages, such as "out-of-pocket expenses" involved in complying with a discriminatory process. *Babb*, 140 S. Ct. at 1179 (Sotomayor, J., concurring).

Lutes therefore may still have a claim if he can establish that any aspect of his differential treatment amounted to a "personnel action" under the ADEA. The differential treatment that Lutes

15

did receive due to his age was, moreover, not insubstantial. Lutes—unlike a hypothetical younger employee who would have failed the FRA if it had been applied to him but avoided it based on his age—was expected to undergo a substantial battery of medical tests that he would not have undergone of his own volition. Moreover, the facts of this case suggest that one of the practical effects of requiring certain employees to receive cardiovascular risk waivers is that employees are nudged toward preventive treatments—including, potentially, surgical ones—in order to salvage their deployability and, by extension, their jobs. Those preventive treatments may be a good idea; it is probably much better to get a heart catheter in Tennessee than to have a heart attack in Afghanistan. Nevertheless, requiring an individual to undergo medical treatment in order to keep his job is a significant, meaningful invasion of his autonomy and privacy by his employer.

The court's duty, however, is to apply the ADEA as written. While "personnel action" does not have an express definition within the text ADEA itself, the Supreme Court, in *Babb*, suggested that the federal-sector provision uses the term in the same way that it is used in the Civil Service Reform Act of 1978 ("CSRA"), *Babb*, 140 S.Ct. at 1173 (citing 5 U.S.C. § 2302(a)(2))—a reasonable assumption, given that both statutes involve federal employment. Lutes cites to the CSRA definition in his briefing as well. (Doc. No. 41 at 4.) The CSRA defines "personnel action" to include:

(i) an appointment;

(ii) a promotion;

(iii) an action under chapter 75 of [Title 5] or other disciplinary or corrective action;

(iv) a detail, transfer, or reassignment;

(v) a reinstatement;

(vi) a restoration;

> (vii) a reemployment;
>
> (viii) a performance evaluation under chapter 43 of this title or under title 38;
>
> (ix) a decision concerning pay, benefits, or awards, or concerning education or training if the education or training may reasonably be expected to lead to an appointment, promotion, performance evaluation, or other action described in this subparagraph;
>
> (x) a decision to order psychiatric testing or examination;
>
> (xi) the implementation or enforcement of any nondisclosure policy, form, or agreement; [or]
>
> (xii) any other significant change in duties, responsibilities, or working conditions . . . .

5 U.S.C. § 2302(a)(2). Notably, that definition expressly includes one type of mandatory medical evaluation—"psychiatric testing or examination"—but makes no mention of the type of physical examinations or testing that Lutes was required to undergo. The ordinary tools of statutory interpretation would therefore suggest that required non-psychiatric medical testing is, in and of itself, not a "personnel action." *See NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369, 383 (6th Cir. 2022) (discussing canon of statutory construction that "the express mention of one thing excludes others"). The court therefore holds that the mere imposition of a risk-assessment-and-waiver requirement directed at a purely physical condition was not, in and of itself, an actionable personnel action for the purposes of the federal-sector provision of the ADEA.

The court notes that the District Court for the Southern District of Ohio reached a different conclusion under the private-sector provision of the ADEA in *Lee v. City of Moraine Fire Dep't*, No. 3:13-CV-222, 2015 WL 914440, at *10 (S.D. Ohio Mar. 3, 2015), which involved a local firefighter/EMT who was fired after refusing to take a physical that was not required of his younger colleagues. *See also E.E.O.C. v. Com. of Mass.*, 987 F.2d 64, 74 (1st Cir. 1993) (adopting similar reasoning in case brought by the EEOC against the State of Massachusetts). The Southern District

17

of Ohio's analysis, however, was based on language in the private-sector provision that does not appear in its federal-sector counterpart. Specifically, the private-sector provision makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a) (emphasis added). The court concluded that the plaintiff's cause of action was viable because the physical was a "condition of employment." *Lee*, 2015 WL 914440, at *15. The federal-sector provision, however, premises liability not on conditions of employment but on personnel *actions*, and the mere imposition of a medical examination policy, without more, does not qualify as such an action under the definition endorsed by the Supreme Court. If the age-conscious policy at issue in this case had actually been the proximate cause of a covered personnel action—such as Lutes' being terminated, like the plaintiff in *Lee* was—then the analysis would be different.

The court expresses no opinion on the question of whether it would be unlawful to deny a civilian Army employee over the age of 40 a deployment opportunity based, in whole or in part, on his results pursuant to a non-psychiatric medical risk assessment tool that is not applied to employees under the age of 40. As Justice Sotomayor observed in her concurrence in *Babb*, "[i]f, for example, an employer hires a 50-year-old person who passed a computer-aptitude test administered only to applicants above 40, clearly a question could arise as to whether the hiring decision was 'made free from' differential treatment." *Babb*, 140 S. Ct. at 1178 (Sotomayor, J., concurring). The same question would arise if an employee were subjected to a personnel action based on a medical test applied along the same unequal lines. That, though, is not what happened here. Rather, the only differential treatment on the basis of age that Lutes has established was unconnected to a qualifying personnel action. At the same time, the only qualifying personnel

action that Lutes has established—the missed deployment—was ultimately untainted by discrimination on the basis of age. In other words, Lutes may have two halves of a claim, but they do not match. The Secretary is therefore entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, the Secretary's Motion for Summary Judgment (Doc. No. 28) will be granted, and Lutes' Motion for Summary Judgment (Doc. No. 33) will be denied.

An appropriate Order will enter.

*[signature]*

ALETA A. TRAUGER
United States District Judge